UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Original Complaint filed IN CAMERA.
SEALED pursuant to 31 U.S.C. §3730(b)(2)**

UNITED STATES ex rel., and
STATE OF FLORIDA ex rel.
TIRSO J. ROJAS, M. D.

BRINGING THIS ACTION ON
HIS OWN BEHALF AND ON BEHALF
OF THE UNITED STATES OF AMERICA
AND THE STATE OF FLORIDA,

      Plaintiffs,

vs.

SHERIDAN HEALTHCARE, INC., and
SHERIDAN HEALTHCORP., INC.,

      Defendants.

_____/

CASE NO. **00-7071**

CIV-FERGUSON
MAGISTRATE JUDGE
SNOW

**COMPLAINT AND JURY DEMAND**



     Plaintiffs, United States ex rel., State of Florida ex rel., and Relator, Tirso J. Rojas, M.D.,

by and through the undersigned attorneys, sue Defendants, Sheridan Healthcare, Inc. and Sheridan

Healthcorp., Inc., and say and allege as follows:

### PRELIMINARY STATEMENT OF CASE

    1.    This is a *qui tam* action filed by Plaintiff, Realtor Tirso J. Rojas, M. D., in the name

of the United States of America and the State of Florida, to recover penalties and damages arising

from, *inter alia*, violations of the Federal False Claims Act and Florida False Claims Act based upon

the false claims submitted by Defendants, who are national healthcare providers of anesthesia

participating in the Medicaid and Medicare Programs.

2.     Defendants operate a physician practice management company which manages, employs and/or affiliates with over 240 physicians, including anesthesiologists, at various hospitals and other medical facilities in the State of Florida and across the United States.

3.     By this Complaint, Plaintiffs seek recovery based upon Defendants' illegal scheme to defraud the United States and State of Florida of millions of dollars in the operation, administration and supervision of the Medicaid and Medicare health insurance programs maintained by the United States through the Department of Health and Human Services ("HHS") and the Health Care Financing Administration ("HCFA"), and by the State of Florida through the Agency for Health Care Administration ("AHCA").

4.     As Medicaid providers, Defendants have made false statements to the United States and the State of Florida by over billing and illegal billing for obstetric patients receiving labor epidurals during delivery. Specifically, Defendants healthcare providers forced obstetric patients who are in delivery to pay in cash or by credit card between $500 to $650 for a labor epidural that would otherwise be fully covered under the Medicaid program and without any cost to the patient. Furthermore, for these Medicaid recipients who paid $500 to $650 in cash for a labor epidural and then delivered by Cesarian Section, false claims were submitted by the Defendants to the Medicaid program as those patients have already paid cash in excess of the amount allowed by the Medicaid program for the labor epidural and time for the Cesarian Section.

5.     As Medicaid and Medicare providers, Defendants have made false statements and submitted false claims to the United States by deliberately and systematically adding and over billing

-2-

fifteen (15) minutes or more for preparation to each anesthesia procedure when this time was already included in the base units for the procedure. This practice is in violation of Defendants own written billing policies.

6.     As a direct result of Defendants improper and illegal billing practices, many thousands of false claims have been processed through the Medicaid and Medicare programs, all with the purpose and effect of defrauding the United States and State of Florida.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1445 and 31 U.S.C. § 3732(a) and (b), over claims for violations of the False Claims Act, 31 U.S.C. § 3732(a) and (b), and Florida False Claims Act, Fla. Stat. § 68.081(2)(a) and (b), and pursuant to 28 U.S.C. § 1367 over the non-federal claims that are so related to the other claims that they form part of the same case on controversy under Article III of the United States Constitution.

8.     Venue is proper under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) in the United States District Court for the Southern District of Florida as all or a substantial part of the events giving rise to the claims occurred, arose, or where directed within Broward County, Florida, in the Southern District of Florida.

9.     Defendants have submitted themselves to the personal jurisdiction of this Court as a result of their (i) status as residents of the State of Florida, (ii) being authorized to do business in the State of Florida; (iii) maintaining their principal place of business within the State of Florida, (iv) committing violations of law within the State of Florida; and (v) causing injury to Plaintiffs as a result of illegal activities in the State of Florida.

10.    All conditions precedent to the prosecution of this action, if any, have been performed, satisfied, waived or excused.

## PARTIES

11.    Plaintiff, Relator, Tirso J. Rojas, M.D., is a citizen of the United States, and a resident of Parkland, Florida. Dr. Rojas brings this action on his own behalf and in the name, and on behalf of the United States of America and the State of Florida.

12.    None of the matters set forth in this Complaint is based upon a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a congressional, administrative, or General Accounting Office report, hearing, audit or investigation; or in the news media.

13.    Dr. Rojas has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived through his employment as an anesthesiologist under contract with Sheridan Healthcare, Inc. and Sheridan Healthcorp, Inc., of the information on which the allegations set forth in this Complaint are based; and he has voluntarily provided such information to the government.

14.    Dr. Rojas has standing to bring this lawsuit on behalf of and in the name of the United States and the State of Florida pursuant to (i) 31 U.S.C. § 3730(b), (ii) Fla. Stat. § 68.083(2), and (iii) the economic injuries suffered by Dr. Rojas due to Defendants' actions as alleged in this Complaint, including the damages to Dr. Rojas' career by the coercive tactics implemented by Defendants as retaliation for Dr. Rojas' notifying Defendants of his discovery of the fraudulent activities and requesting that Defendants comply with the law.

-4-

15.    Defendant, Sheridan Healthcare, Inc. ("Sheridan Healthcare"), is a Delaware corporation, and physician practice management company which affiliates with physicians in providing physician services in Florida and other locations throughout the United States. Sheridan Healthcare maintains its principal offices in Broward County, Florida.

16.    Defendant, Sheridan Healthcorp., Inc. ("Sheridan Healthcorp."), is a Delaware corporation , and wholly owned subsidiary of Sheridan Healthcare, which maintains its principal offices in Broward County, Florida. Sheridan Healthcare and Sheridan Healthcorp. are hereinafter sometimes collectively referred to as the "Sheridan Defendants."

17.    At all times pertinent to the Complaint, the Sheridan Defendants provided anesthesia services at hospitals located in Florida and other locations throughout the United States.

## GOVERNMENT PROGRAMS HARMED

18.    Title XIX of the Social Security Act of July 30, 1965, 42 U.S.C. § 1396 et. seq., establishes a medical assistance program known as the Medicaid Program. The Medicaid Program is a health insurance program administered by Florida and other participating states, and paid for by the participating state and the United States Government.

19.    The Medicaid Program is designed to assist participating states in providing medical services and durable medical equipment to families with dependent children, to the aged, the mentally infirmed, the blind, and totally disabled individuals whose income and resources are insufficient to meet the cost of necessary medical services. The assistance is provided by the United States Department of Health and Human Services ("HHS") to participating states including funding of approximately fifty percent (50%) of each state's eligible Medicaid costs.

-5-

20.    Medicaid is paid primarily on a per diem basis, which means a certain amount of money is paid daily for the hospital stay of the Medicaid patient for certain covered services. In the State of Florida, the Medicaid Program is administered by the AHCA.

21.    The Medicare Program is a system of health insurance created by Title XVIII of the Social Security Act, 42 U.S.C. § 1395, which provides medical insurance benefits for individuals sixty-five (65) years of age or older, and disabled individuals entitled to Social Security benefits. Part A of the Medicare Program provides insurance for hospital and hospital based services, including anesthesia services such as those provided by the Sheridan Defendants.

22.    The HCFA is the agency of HHS responsible for the operation, administration, and supervision of the Medicaid and Medicare Programs.

### FACTUAL BACKGROUND

23.    Tirso J. Rojas, M. D. is a  physician licensed in the State of Florida, License No. 40634, and a practicing Board Certified Anesthesiologist.

24.    In February, 1989, Dr. Rojas  was employed as an anesthesiologist with Plantation-Tamarac Anesthesia Group, P.A., also known as Taranco and Associates Anesthesia Group, Inc. ("Taranco Group").

25.    After four years, or in about 1993, he became a shareholder in the Taranco Group. Since 1989 to the present, Dr. Rojas has practiced medicine providing anesthesia at Plantation General Hospital ("Plantation General"), 401 N. W. 42nd Avenue, Plantation, Florida 33317, and University Hospital and Medical Center ("University Hospital"), 7201 N. University Drive, Tamarac, Florida 33321.  Plantation General was the busiest hospital for obstetrics in Broward

County for 1998 and 1999, with well over 4,000 deliveries per year, a substantial percentage of which were for Medicaid patients. University Hospital is located in a retirement community and its patient census is comprised largely of the elderly over sixty-five (65) years of age who are recipients in the Medicare program.

26.    Pursuant to agreements made with Sheridan Healthcorp and its parent company, Sheridan Healthcare, Dr. Rojas' stock and the stock of his other physician partners in the Taranco Group was sold to the Sheridan Defendants in early January, 1998. Initially, the Sheridan Defendants managed the Taranco Group under a Management Services Agreement. Sometime in late 1998, the Sheridan Defendants exercised an option to buy all the shares of the Taranco Group.

27.    The Sheridan Defendants operate a national physician practice management group employing or managing specialists and physicians providing services at hospitals and ambulatory surgical facilities in the areas of anesthesia, neonatology, pediatrics, emergency services, obstetrics and pain management. In addition, the Sheridan Defendants own and operate, or manage, office-based gynecological, obstetrical, infertility, perinatology, primary care and surgical physician practices. As of May, 1999, the Sheridan Defendants were affiliated with approximately 240 physicians practicing under 55 speciality service contracts at 37 hospitals and at 28 office locations in Florida, New York, Ohio, Pennsylvania, Texas, Virginia and West Virginia.

28.    From 1989 to present, Dr. Mitchell Eisenberg has held the positions of President and Chief Executive Officer of the Sheridan Defendants. In late 1994, according to an announcement by the venture capital group involved in the transaction, Dr. Eisenberg led a small group of owners to complete a management buy-out of the predecessors of the Sheridan Defendants, which soon

-7-

afterwards completed an initial public offering of the stock (which traded under the symbol "SHCR"). A copy of the announcement for the management buy-out is attached as Exhibit "A."

29.    According to an authorized press releases in May, 1999, the Sheridan Defendants removed their stock from the public market in a $155 million going private transaction funded by Vestar Capital Partners, an investment and capital venture firm that manages more than one billion dollars in equity capital and specializes in management buyouts and growth capital investments for such companies as Celestial Seasonings, Clark-Schwebel, Consolidate Cigar, Hampshire Chemical, Insight Communications, Remington Products, Sun Apparel, and Westinghouse Air Brake. A copy of one of the press releases is attached as Exhibit "B."

## FALSE CLAIMS SUBMITTED BY THE SHERIDAN DEFENDANTS

### A.    Improper Billing for Labor Epidurals Under the Medicaid Program.

30.    Approximately five years ago, in the Summer of 1995, the Taranco Group began to bill Medicaid patients directly for labor epidural analgesia ("labor epidurals") outside the Medicaid Program and the Medicaid Provider Agreement with the State of Florida. The Taranco Group implemented this practice due to the large amount of Medicaid patients who requested labor epidurals and after the Taranco Group learned that one of our competitors, the Sheridan Defendants, billed in this fashion at many hospital facilities in Broward and Dade County, including Memorial Hospital West ("Memorial West"), 703 Flamingo Road, Pembroke Pines, Florida 33028; Memorial Regional Hospital ("Memorial Regional"), 3501 Johnson Street, Hollywood, Florida 33021; and Aventura Hospital & Medical Center, 20900 Biscayne Boulevard, Aventura, Florida 33180.

-8-

31.     Along with Plantation General, Memorial Regional and Memorial West operate the busiest obstetric units in Broward County, Florida. Each hospital delivers approximately 4,000 babies per year, of which a substantial percentage (perhaps 20%) are deliveries for Medicaid patients. In addition to these hospitals, the Sheridan Defendants also provide labor epidurals at many other hospitals in Florida and in other states, and the improper billing practices detailed below were most likely implemented by the Sheridan Defendants at those other facilities.

32.     In January, 1998, the Sheridan Defendants acquired the Taranco Group. The general counsel for the Sheridan Defendants was at that time, and still is, an attorney named Jay Martus. After the acquisition by the Sheridan Defendants, the anesthesiologists at Plantation General, including Dr. Rojas, learned of an article published in November, 1998, by David J. Birnbach, M.D., President of the Society for Obstetric Anesthesia Perinatology. In his article, Dr. Birnbach referenced a newspaper report in the L.A. Times and an ABC Nightline program regarding a hospital in California that was under investigation for denying a Medicaid patient a labor epidural. A copy of Dr. Birnbach's article is attached as Exhibit "C."

33.     Dr. Rojas closely reviewed these articles, and as a result of discussions with other anesthesiologists at Plantation General, the Chief, Dr. Taranco, was asked to speak with Mr. Martus to inquire whether the billing practice of requiring a Medicaid patient in labor to pay separately for a labor epidural otherwise fully covered under the Medicaid Program was improper in any way. One of the obstetricians at Plantation General, Dr. Robert Schickler, brought to the attention of The Taranco Group another article relating to the impropriety of billing Medicaid patients in labor

-9-

directly for labor epidurals. Another obstetrician, Dr. Herman Epstein, also complained to the administration at Plantation General about this practice.

34.     Mr. Martus assured the Chief of the Taranco Group that the billing practice of asking for payment in cash from patients in labor was in full compliance with all government rules and regulations and was not improper. Another partner, and Vice Chief of our group, Dr. Laurence Skolnick, also confirmed Mr. Martus' statement. Not only did the Sheridan Defendants refuse to change the billing practice, after our Chief spoke to Mr. Martus, the Sheridan Defendants actually increased the fees charged to, and collected from Medicaid patients in labor from $500 to $650 for providing labor epidurals. This amount is more than quadruple what the Sheridan Defendants could collect through the Medicaid Program for the labor epidurals, which until November, 1999 was approximately $120.00.

35.     The increase in the charge, effective January 1, 1999, is reflected in a Memo dated February 2, 1999, a copy of which is attached as Exhibit "D." A copy of the forms used to collect the payment from the Medicaid patients in labor is attached as Exhibit "E." This form was used, and the Sheridan Defendants continued to collect cash from Medicaid patients in labor until August, 1999, which was after Dr. Rojas took formal steps to question this billing practice.

36.     Despite the assurances of Mr. Martus, the general counsel for the Sheridan Defendants, Dr. Rojas felt that this billing practice effectuated an immoral if nor improper double standard and resulted in substandard care for Medicaid patients in labor. It seemed to Dr. Rojas that the Sheridan Defendants were engaged in the same billing practices which were being investigated at the California hospital. Dr. Rojas found that other hospitals in the community serviced by

anaesthesia groups which were not part of the Sheridan Defendants did not follow this billing practice. Some of these hospitals included: Broward General Medical Center, 1600 South Andrews Avenue, Fort Lauderdale, Florida 33316, Coral Springs Medical Center, 3000 Coral Hills Drive, Coral Springs, Florida 33065 and North Ridge Medical Center, 5757 N. Dixie Highway, Fort Lauderdale, Florida 33334.

37.    At Plantation General, and many other hospitals in which the Sheridan Defendants provide anesthesia, labor epidurals are routinely, and as a standard practice, provided to all insured and private patients. Until very recently, Medicaid patients in labor were forced to pay $500 or $650 in cash or by credit card for a labor epidural or the labor epidural was denied.    The nurses at Plantation General would not call the anesthesiologist unless the Medicaid patient agreed in writing to pay the additional charge for a labor epidural. The administration at Plantation General was aware of this billing practice.

38.    This billing practice implemented by the Sheridan Defendants at all the hospital facilities where it provided labor anesthesia services, and violated at least three sections of the Medicaid Provider Agreement ("MPA"). A specimen of the MPA is attached as Exhibit "F."

39.    Paragraph 1 of the MPA prohibits discrimination by any provider in the Medicaid program. The Sheridan Defendants violated this provision by enforcing a discriminatory billing policy. It is standard practice for insureds and private patients to receive epidurals at Plantation General, and it is the responsibility of the Sheridan Defendants to ensure the same level of service is also provided to Medicaid patients. This double standard forces Medicaid patients who cannot

-11-

afford to make the direct payment to take intravenous medicines which constitutes substandard care when compared to the epidurals made available to insureds and private patients.

40.     This billing practice of the Sheridan Defendants also violates Section 2 of the MPA requiring that the quality of the services rendered by the provider be comparable to those furnished by the provider's peers. The discriminatory billing practices of the Sheridan Defendants subjected Medicaid patients to a double standard in care very distinct from what occurs at other hospitals in the area, including Broward General Medical Center, Coral Springs Medical Center, and North Ridge Medical Center.

41.     These billing practices also violate Section 5(h) of the MPA. The Sheridan Defendants do not accept the Medicaid payment for labor epidural as payment in full, but bill and collect the exorbitant fee of $650.00 (when approximately $120.00 is authorized under the Medicaid program) for the service directly from the Medicaid recipient while the patient is in labor. Checks are only accepted when delivered and cleared in advance, and the vast majority of Medicaid patients must pay at the time of delivery and during labor in cash or with credit cards. Without a direct payment, no epidural was provided by the Sheridan Defendants to the Medicaid patient.

42.     Separate merchant accounts at Plantation General were established for collecting the direct payments from Medicaid patients for labor epidurals. At Plantation General, the merchant account number is 5303 54174 for Visa/MasterCard, and the merchant account number is 4096559562 for American Express. The Sheridan Defendants maintained similar merchant accounts with different numbers at the other hospitals where it provides labor epidurals.

43.    A related improper practice employed by the Sheridan Defendants involves over billing for Medicaid patients from whom the $500 to $650 for a labor epidural was collected and the patient also received a Cesarian Section.  In these cases, the Medicaid Program was improperly billed for the anesthesia time for the Cesarian Section when the patient already had paid an amount of money in excess of the amount allowed by the Medicaid Program for the labor epidural and the time for Cesarian Section.  This double billing practice is verified in Exhibit "E," in which the Sheridan Defendants admit that "If the delivery is by Cesarian Section, Medicaid will be billed for this medically necessary service.  The Cesarian Section will be separately charged for which [the patient is] not responsible."

44.    In these instances, however, the Medicaid patient has already paid in cash or by credit card for a labor epidural (in an amount over quadruple that which the Sheridan Defendants could collect through the Medicaid Program).  Therefore, the Medicaid Program is fraudulently billed by the Sheridan Defendants because the patient has already paid in cash or credit card an amount well in excess of what should have been charged under Section 5(h) of the MPA when the patient has a labor epidural and Cesarian Section.

45.    In a letter dated July 9, 1999, and through his lawyer, Dr. Rojas advised the Sheridan Defendants about his concern over the improper billing practices for labor epidurals given to Medicaid patients.  Also in July, 1999, Dr. Rojas filed a complaint with the Regional Fraud and Abuse Coordinator, Atlanta Regional Office, Health Care Financing Administration, 61 Forsyth Street, S.W., Suite 4T20, Atlanta, Georgia 30303-8909.  Copies of his lawyer's letter and the HCFA complaint are attached, respectively, as Exhibits "G" and "H."

-13-

46.     Later, in a Memo dated August 18, 1999, sent to all anesthesia chiefs and vice-chiefs, the Sheridan Defendants announced that "any Medicaid patient requesting epidural analgesia under our care will not be responsible for making any payments, nor should any payments be requested." The Sheridan Defendants explained that it changed its billing practices "[i]n accordance with new Medicaid guidelines." A copy of this Memo is attached as Exhibit "I."

47.     There was no recent change in policy.  The improper billing practice stopped only after a letter was sent by Dr. Rojas' lawyer and a complaint to the HCFA.  According to the Medicaid Physicians Coverage and Limitations Handbook, "Anesthesiologists may not refuse to provide a labor epidural to a Medicaid recipient or ask for renumeration in cash for the procedure at the time the woman is in labor." This policy is attached to a cover letter dated April 14, 2000 from a representative of Health Care Administration, State of Florida, and both are attached as composite Exhibit "J."

48.     In a letter dated December 30, 1999, Dr. Rojas advised Dr. Mitchell Eisenberg, President of the Sheridan Defendants, of his concerns about improper billing practices. Dr. Rojas also offered his assistance in helping the Sheridan Defendants to address these billing issues. A copy of Dr. Rojas' December 30, 1999 letter is attached as Exhibit "K." For six weeks, Dr. Rojas received no response to his letter.

49.     Finally, on behalf of the Sheridan Defendants, Gilbert Drozdow, M.D., M.B.A., Vice President, Hospital-Based Services, in a letter dated February 14, 2000, threatened to terminate Dr. Rojas' employment and to sue him for questioning these billing practices and demanded that he not

-14-

speak to anyone about these issues. A copy of Dr. Drozdow's February 14, 2000 letter is attached as Exhibit "L."

50.     Although in a letter dated February 23, 2000, Dr. Rojas requested the pertinent information to support Dr. Drozdow's position that the Sheridan Defendants are "amongst the was a compliant providers," none of the information has ever been furnished to Dr. Rojas, and he has never been afforded the opportunity to discuss these issues with the billing compliance officer for the Sheridan Defendants. A copy of his February 23, 2000 letter is attached as Exhibit "M."

### B.     Documentary Corroboration of Medicaid Fraud.

51.     The anesthesia records at the hospital where the Sheridan Defendants provide anaesthesia will show the Medicaid patients who received labor epidurals. The Sheridan Defendants will have records for each of these patients reflecting whether the patients paid by cash or with credit cards. For each hospital, the Sheridan Defendants maintained merchant accounts for collecting credit card payments for the labor epidurals. These records will verify that the medicaid patients were forced by the Sheridan Defendants to pay in cash or with a credit card for epidurals while in labor.

52.     The hospital records will also identify the Medicaid patients who received a labor epidural and delivered by Cesarian Section. Once these patients are identified, the billing records of the Sheridan Defendants will show that Medicaid was improperly charged as the patient was already forced to make an advanced payment in excess of the amount allowed for the Medicaid Program for both services.

53.    Finally, these same records will verify which Medicaid patients were denied a labor epidural in violation of Section 1 of the MPA.  See Exhibit "F."

**C.    Improper Padding of Anesthesia Time Under the Medicare and Medicaid Programs.**

54.    Another billing practice by the Sheridan Defendants which is improper and illegal constitutes the routine addition of fifteen (15) minutes or more of anesthesia time to each case as pre-op interview and examination, including all Medicaid and Medicare cases.  Prior to being acquired by the Sheridan Defendants, the anesthesiologists in the Taranco Group never added time in this fashion.  Immediately after the acquisition, Dr. Lewis Gold, an officer and representative of the Sheridan Defendants, instructed us to implement this billing practice.  Also present at the meeting during which Dr. Gold gave these instructions were other members of the Taranco Group, including Rafael Arango, M.D., Eduardo Marti, M.D., Laurence Skolnick, M.D., Ramiro Rodriguez, M.D., Joaquin Taranco, M.D., Stewart Leaderman, D.O. and Charles Merson, M.D.

55.    Dr. Rojas suspected that adding this time was illegal, but Dr. Gold reassured the Taranco Group during the meeting that this was a proper and legal billing practice and that the Sheridan Defendants had for years billed in this fashion and no one from the Medicaid or Medicare Programs complained.

56.    Dr. Gold said that the Taranco Groups was "losing a lot of revenue on the 7,000 anesthetic cases per year" done by the Taranco Group.

57.    This systematic billing practice is detailed in an October 14, 1999 Memo from Dr. Stuart Leaderman, the current Chief of Anesthesia at Plantation Hospital.  A copy of the October 14, 1999 memo is attached as Exhibit "N."  This Memo confirms that the billing records of the Sheridan

-16-

Defendants were falsified in padding anesthesia time for pre-op interview and examination beginning at least fifteen (15) minutes before the patient even enters the operating room suite. In some cases, the surgeon is late and additional time is improperly billed as interview time in excess of 15 minutes.

58.    For many years, the Sheridan Defendants have engaged in this systematic and illegal billing practice involving on an annual basis  thousands of anesthesia cases at the various hospitals throughout Florida and other states.

59.    This systematic padding of 15 minutes or more to each anesthesia case is contrary to the Anesthesia Billing Procedure Manual for the Sheridan Defendants. The pertinent section, a copy of which is attached as Exhibit "O," provides in part: "the time spent in the evaluation of a surgical patient pre-operatively is not separately reimbursable as it is considered in the base unit of the procedure." The American Society of Anesthesiologists also agrees with this position. See Exhibit "P."

60.    Following Dr. Rojas' December 30, 1999 letter raising his concerns about other illegal billing practices, Dr. Leaderman sent a Memo dated April 25, 2000, reversing his prior billing instructions and advised that anesthesiologists at Plantation Hospital should stop the practice of adding fifteen (15) minutes of anesthesia time to each case. A copy of this April 25, 2000 memo is attached as Exhibit "P." Apparently, the Sheridan Defendants are attempting to conceal this illegal billing practice, as opposed to conform with the legal requirements that the pre-op evaluation and examination is included in the base units and should not be billed separately.

-17-

61.     Unfortunately, even prior to its efforts to camouflage this illegal practice, the Sheridan Defendants submitted and collected thousands of inflated Medicare claims. On April 26, 2000, the Taranco Group held its monthly meeting at Plantation General. Dr. Taranco reviewed with the Group the contents of Leaderman's April 25th Memo. Dr. Taranco told the Group to stop adding an additional 15 minutes because it was illegal. Instead, he told the Group to give sedatives or other drugs intravenously to the patient at the time of the interview to justify adding the 15 minutes so the revenue would not be lost.

62.     Dr. Taranco's billing instructions were confirmed in writing by Dr. Drosdow in his memo dated May 8, 2000 a copy of which is attached as Exhibit "Q." In order to preserve revenues and continue padding the anesthesia bill, the Sheridan Defendants presently enforce a billing practice that may seriously jeopardizes patient care, especially for elderly patients who are very sensitive to sedatives. Specifically, the anesthesiologists are directed by the Sheridan Defendants to administer sedative intravenously while the patient is in the holding area and without access to monitors.

**D.     Documentary Corroboration of Medicare and Medicaid Fraud**.

63.     To verify the padding of the anesthesia bills submitted to the Medicaid and Medicare Programs for reimbursement, the anesthesia records can be obtained from the hospitals at which the Sheridan Defendants provide anesthesia services. Each anesthesia record will contain a specific reference to "interview time." The number of minutes for this activity will also be shown.

64.     The billing cards can also be obtained from the Sheridan Defendants. The billing cards have a specific category for pre-op evaluation time, with a start and stop time. This time will

match the hospital's anesthesia record. This time will be included in the bills for anesthesia services paid by the Medicare and Medicaid Programs.

### E.    Threats and Intimidation

65.    Witnesses may be reluctant to cooperate with an investigation. As previously indicated, Dr. Rojas has been threatened with a lawsuit and the loss of his job for attempting to bring these issues to the attention of the Sheridan Defendants and others may be subjected to similar threats.

66.    Also, sometime after he filed his complaint with the HCFA, the general counsel for the Sheridan Defendants, Mr. Martus, circulated a memo dated December 14, 1999, which seems to warn all employees not to talk to anyone regarding the billing practices of Sheridan Defendants. A copy of Mr. Martus' December 14, 1999 memo is attached as Exhibit "R."

67.    Dr. Rojas is obligated to pay his attorneys a reasonable fee and such attorney's fees are recoverable pursuant to 31 U.S.C. § 3730(d)(1) and Fla. Stat. § 68.086(2).

### COUNT I
### FALSE CLAIMS ACT
### (31 U.S.C. §§ 3729(a)(1) and (2))

68.    This is an action brought by Dr. Rojas on behalf of the United States against the Sheridan Defendants under the False Claims Act, 31 U.S.C. §§3729(a)(1) and (2).

69.    The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are hereby incorporated as if fully restated.

70.    The Sheridan Defendants knowingly, and in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, and may still

be presenting through a false record or statement false or fraudulent claims for payment to officials of the United States Government serving in the Medicaid and Medicare Programs, all in violation of 31 U.S.C. § 3729(a)(1).

71.    The false claims for payment presented or caused to be presented by the Sheridan Defendants include, but are not limited to:

(a)    submitting bills or cost reports for reimbursement through the Medicaid Program for anesthesia services provided to obstetric patients who were forced to pay the Sheridan Defendants, while in delivery, in cash or by credit card between $500 to $650 for a labor epidural that would otherwise be fully covered by the Medicaid Program;

(b)    submitting bills or costs reports for reimbursement through the Medicaid Program for anesthesia services for obstetric patients who receive a labor epidural and delivery by Cesarian Section and have had already paid in cash or by credit card in an amount well in excess of the amount allowed by the Medicaid Program for the labor epidural and time for the Cesarian Section anesthesia; and

(c)    submitting bills or cost reports for reimbursement through the Medicaid and Medicare Programs for which systematically included an over-billing of fifteen minutes for preparation of each anesthesia procedure when that time was already included in the base unit for the procedure;

72.    The United States, unaware of the falsity of the claims, cost reports and statements made by the Sheridan Defendants, and in reliance on the punitive accuracy of the information

involved, paid and may continue to pay for the subject anesthesia services for which the Sheridan

Defendants seek reimbursement through the Medicaid and Medicare Programs.

73.    As a direct and proximate result of the actions and omissions of the Sheridan

Defendants, the United States has suffered and will continue to suffer substantial damages in an

amount yet to be precisely determined.

**COUNT II**
**FLORIDA FALSE CLAIMS ACT**
**(Fla. Stat. § 68.082(2)(a) and (b))**

74.    This is an action brought by Dr. Rojas on behalf of the United States against the

Sheridan Defendants under the Florida False Claims Act, Fla. Stat. § 68.082(2)(a) and (b).

75.    The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are hereby

incorporated as if fully restated.

76.    The Sheridan Defendants knowingly, and in reckless disregard or deliberate ignorance

of the truth or falsity of the information involved, presented or caused to be presented, and may still

be presenting false or fraudulent claims through a false record or statement for payment to officials

of the United States Government serving in the Medicaid Program, all in violation of Fla. Stat. §

68.082(2)(a) and (b).

77.    The false claims for payment presented or caused to be presented by the Sheridan

Defendants include, but are not limited to:

(a)    submitting bills or cost reports for reimbursement through the Medicaid

Program for anesthesia services provided to obstetric patients who were forced to pay the Sheridan

-21-

Defendants, while in delivery, in cash or by credit card between $500 to $650 for a labor epidural that would otherwise be fully covered by the Medicaid Program;

      (b)    submitting bills or costs reports for reimbursement through the Medicaid Program for anesthesia services for obstetric patients who receive a labor epidural and delivery by Cesarian Section and have had already paid in cash or by credit card in an amount well in excess of the amount allowed by the Medicaid Program for the labor epidural and time for the Cesarian Section anesthesia.

      (c)    submitting bills or cost reports for reimbursement through the Medicaid Program for which systematically included an over-billing of fifteen minutes for preparation of each anesthesia procedure when that time was already included in the base unit for the procedure.

78.    The State of Florida, unaware of the falsity of the claims, cost reports and statements made by the Sheridan Defendants, and in reliance on the punitive accuracy of the information involved, paid and may continue to pay for the subject anesthesia services for which the Sheridan Defendants seek reimbursement through the Medicaid Program.

79.    As a direct and proximate result of the actions and omissions of the Sheridan Defendants, the State of Florida has suffered and will continue to suffer substantial damages in an amount yet to be precisely determined.

## COUNT III
## UNJUST ENRICHMENT

80.    This is an action brought by Dr. Rojas on behalf the United States and the State of Florida against the Sheridan Defendants pursuant to common law for unjust enrichment.

-22-

81.    The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are incorporated as if fully restated.

82.    The Sheridan Defendants were paid substantial funds by the United States of America and the State of Florida through the Medicaid and Medicare Programs to which the Sheridan Defendants were not entitled.

83.    As a direct and proximate result of the actions and omissions by the Sheridan Defendants, the Sheridan Defendants were unjustly enriched at the expense of the United States and the State of Florida in an amount yet to be precisely determined, under circumstances that, in equity and good conscience, should be returned to the United States and State of Florida.

## COUNT IV
## PAYMENT BY MISTAKE OF FACT

84.    This is an action brought by Dr. Rojas on behalf of the United States and the State of Florida against the Sheridan Defendants pursuant to common law for mistake of fact.

85.    The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are incorporated as if fully restated.

86.    As a direct and proximate result of the actions and omissions on the part of the Sheridan Defendants, the United States and State of Florida paid monies to the Sheridan Defendants through the Medicaid and Medicare Programs under mistake of fact, and have been significantly damaged in an amount yet to be precisely determined.

## COUNT V
## RETALIATION AND DISCRIMINATION AGAINST
## AN EMPLOYEE FOR INVESTIGATING AND
## DISCLOSING VIOLATIONS OF THE FALSE CLAIMS ACT
## (31 U.S.C. § 3730(h))

-23-

87.   This is a civil action brought by Dr. Rojas on his own behalf against the Sheridan Defendants for violations of 31 U.S.C. § 3730(h).

88.   The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are incorporated as if fully restated.

89.   Dr. Rojas has been, and reasonably fears he will continue to be the target of threats of discharge from his employment and lawsuits, and other harassment and discrimination from the Sheridan Defendants solely because of the lawful acts of Dr. Rojas in investigating and disclosing violations of the Federal Claims Act.

90.   As a direct and proximate result of the acts and omissions on the part of the Sheridan Defendants, Dr. Rojas has suffered loss of job security, career advancement, and severe physical and emotional distress, and Dr. Rojas is in entitled to all relief necessary to make him whole including compensatory and punitive damages, litigation costs and reasonable attorney's fees.

## <u>COUNT VI</u>
## RETALIATION FOR DISCRIMINATION AGAINST AN EMPLOYEE INVESTIGATING AND DISCLOSING VIOLATIONS FO THE FLORIDA FALSE CLAIMS ACT
### (Fla. Stat. § 68.088)

91.   This is a civil action brought by Dr. Rojas on his own behalf against the Sheridan Defendants, pursuant to Fla. Stat. § 112.3187, for violations of Fla. Stat. § 68.088.

92.   The facts set forth in paragraphs 1 through 67, inclusive, of the Complaint are incorporated as if fully restated.

-24-

93.    Dr. Rojas has been and reasonably fears he will continue to be the target of threats of discharge from his employment and lawsuits, and other harassment and discrimination from the Sheridan Defendants solely because of the lawful acts of Dr. Rojas in investigating and disclosing violations of the Florida Federal Claims Act.

94.    As a direct and proximate result of the acts and omissions on the part of the Sheridan Defendants, Dr. Rojas has suffered loss of job security, career advancement, and severe physical and emotional distress, and Dr. Rojas is in entitled to all relief necessary to make him whole including compensatory and punitive damages, litigation costs and reasonable attorney's fees.

## **REQUEST FOR RELIEF**

Plaintiff, Tirso J. Rojas, M.D., acting on his own behalf and in the name of the United States and the State of Florida, hereby demands and seeks that judgment be entered in favor of him, the United States and the State of Florida against Defendants, Sheridan Healthcare, Inc. and Sheridan Healthcorp., Inc., jointly and severally, as follows:

a.    Actual damages incurred by the United States

b.    Actual damages incurred by the State of Florida

c.    For an award of treble damages to the United States

d.    For an award of treble damages to the State of Florida

e.    For civil penalties of $10,000.00 for each false claim submitted to the United States through the Medicaid and Medicare Programs

f.    For civil penalties in the amount of $10,000.00 for each false claim submitted to the State of Florida through the Medicaid Program;

-25-

g.    For interest on actual and treble damages from the date on which the damages were incurred and on the civil penalties from the date on which this Complaint served upon the Defendants

h.    For all costs and expenses of this civil action

i.    Additionally, Plaintiff Tirso Rojas, M.D. acting on his behalf, demands and seeks that an award be made in his favor as follows:

(i)    For 25% of the proceeds collected by the United States, if the United States proceeds with and conducts this action; or for 30% of such proceeds if the United States does not so proceed;

(ii)    For 25% of the proceeds collected by the State of Florida, if the State of Florida proceeds with an conducts this action; or for 20% of such proceeds if the United States does not so proceed;

(iii)    For double his lost salary and other benefits, including interest on such increases and bonuses;

(iv)    For an amount for reasonable expenses necessarily incurred by Dr. Rojas in prosecuting this action;

(v)    For an amount of $1,000,000.00 for damage incurred by Dr. Rojas to his professional reputation and career; and

(vi)    For all reasonable expenses incurred by Dr. Rojas in relation with these proceedings, plus all attorney's fees and costs for which Dr. Rojas may show himself justly entitled.

-26-

j.    For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury on any issue triable

of right by a jury.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, upon completion of investigation and discovery, to assert such

additional claims for relief against Defendants and other responsible parties as may be warranted

under the circumstances.

Dated: July, 28, 2000.

NAVON, KOPELMAN,
O'DONNELL & LAVIN, P.A.
Attorneys for Plaintiff/Realtor
2699 Stirling Road, Suite B-100
Fort Lauderdale, FL 33312
Telephone: (954) 967-2788
Facsimile: (954) 983-7021

By: _____
   Gary W. O'Donnell
   Florida Bar No. 478148

# TA Associates Portfolio Company:
# Sheridan Healthcare
# (NASDAQ: SHCR)



Sheridan Healthcare, located in Hollywood, FL, provides contract anesthesia and emergency room services, and owns and manages primary care practices. The majority of Sheridan's revenues come from South Florida, but the company is expanding into other regions including New York and Texas. Sheridan contracts with hospitals and other medical groups to manage their anesthesia and emergency room departments, scheduling the doctors and providing billing and administrative services. The primary care division is still developing but currently consists of a number of acquired practices. The focus of the primary care division is to take capitation for all the medical costs of an individual HMO subscriber.

TA approached Sheridan in 1991 as part of a focus on the contract services area, including anesthesia. We kept in touch with the physician-owners, and in 1994 an opportunity emerged for a small group of the owners to purchase the interests of their selling partners. TA helped that group complete the MBO of Sheridan in late 1994. Dr. Mitchell Eisenberg, a practicing anesthesiologist, had been President and CEO since 1989, and remained in that position. To complete the MBO, we employed senior and subordinated debt, in addition to TA's and management's equity. In late 1995, Sheridan completed a successful IPO, which allowed it to strengthen its balance sheet and to begin purchasing primary care practices with public stock and cash.

For additional information on this company, please contact Richard D. Tadler at (617) 574-6708 or Email at tadler@ta.com.

---

Home | Criteria | Facts | Industries | Investments | Teams | Portfolio | IPOs

---

Associates

**Boston ■ Pittsburgh ■ Menlo Park**

High Street Tower, Suite 2500 ~ 125 High Street ~ Boston, MA 02110
Tel: 617-574-6700 ~ Fax: 617-574-6728 ~ Email: info@ta.com

70 Willow Road, Suite 100 ~ Menlo Park, CA 94025
Tel: 650-328-1210 ~ Fax: 650-326-4933

One Oxford Center, Suite 4260 ~ Pittsburgh, PA 15219-1407
Tel: 412-441-4949 ~ Fax: 412-441-5784

# Vestar/Sheridan Holdings, Inc. and Sheridan Healthcare Complete Merger

HOLLYWOOD, Fla. (BW HealthWire), May 10, 1999, Vestar/Sheridan Holdings, Inc. announced today that it has completed the acquisition of Sheridan Healthcare, Inc. (Nasdaq/NM:SHCR). Sheridan has been merged with a wholly owned subsidiary of Vestar/Sheridan Holdings, Inc. and each share of Common Stock, par value $.01 per share, and Non-Voting Common Stock, par value $.01 per share of Sheridan not previously purchased in the tender offer which expired at 12:00 Midnight, EST, on April 27, 1999, has been converted into the right to receive $9.25 in cash, net to the seller, without interest.

Sheridan Healthcare, Inc. is a physician practice management company which employs or manages specialist physicians providing services at hospitals and ambulatory surgical facilities in the areas of anesthesia, neonatology, pediatrics, emergency services, obstetrics and pain management. In addition, it owns and operates, or manages, office-based gynecological, obstetrical, infertility, perinatology, primary care and surgical physician practices. The Company is currently affiliated with approximately 240 physicians practicing under 55 specialty service contracts at 37 hospitals and at 28 office locations.

Vestar Capital Partners is a leading investment firm that manages more than $1 billion in equity capital and specializes in management buyouts and growth capital investments. Vestar invests, as partners with management teams, in high-quality, middle market companies. Since its founding in 1988, Vestar has completed approximately 30 transactions with a total value in excess of $6 billion. Prior transactions include Celestial Seasonings, Clark-Schwebel, Consolidated Cigar, Hampshire Chemical, Insight Communications, Remington Products, Sun Apparel and Westinghouse Air Brake.

**Contact:**

Sheridan Healthcare, Inc., Hollywood
Michael Schundler, 954-986-7506

Back to What's New page

**Professional Information**

# November 1998

# In the Spotlight:
# Epidural Analgesia for Labor - A Necessity or a Luxury?

*David J. Birnbach, M.D., President*
*Society for Obstetric Anesthesia and Perinatology*

On June 16, 1998, an article titled "Childbirth Anesthesia Refusals Spur Probe" appeared in the *Los Angeles Times*. (The text of the article can be obtained on the Internet at <http://www.latimes.com/>.) This article described the alleged denial of epidural analgesia to a patient with Medi-Cal insurance at Northridge Hospital in Los Angeles and has produced an avalanche of letters to ASA, the Society for Obstetric Anesthesia and Perinatology (SOAP) and the California Society of Anesthesiologists. Because there are so many strongly held opinions regarding this subject, I have been asked, as President of SOAP, to discuss this case and the issues that have arisen from it.

There is little debate that the incident at Northridge Hospital, if it occurred as reported, was counter to the guidelines of the American Society of Anesthesiologists, since that particular patient might have been denied an epidural block due to her insurance status and her inability to come up immediately with sufficient cash while in labor. The ASA "Guidelines for the Ethical Practice of Anesthesiology" clearly state, "Anesthesiologists share with all physicians the responsibility to provide care for patients irrespective of their ability to pay for their care." As I have previously stated, we do not have all of the details about that specific California case and, therefore, we should not rush to judgment about that specific event. Although I made that comment to the reporters, it apparently was not important enough for inclusion in the newspaper articles!

This case, however, brings up numerous issues of considerable importance, which I would like to discuss. I have taken these questions (in bold) and statements from the letters which have been sent to SOAP and will attempt to address the key issues.

***Is analgesia for labor an "elective extravagance" or is it a patient's right to receive pain relief during labor?***

Although a few continue to debate this question, it has been addressed many times, and the consensus of opinion is that any patient who desires analgesia for childbirth should receive it. An anesthesiologist asked, "If a woman wants breast implants or a rhinoplasty for cosmetic correction and is on welfare, would it also be unethical and reprehensible to charge her?" Labor is not elective, it is extremely painful to most women, and the relief of labor pain should not be compared with a request for elective cosmetic surgery. ASA President William D. Owens, M.D., has stated that "pain during childbirth is no different than severe pain suffered by a person after surgery or a person who has been shot or in an accident." In addition, a joint statement by ASA and the American College of Obstetricians and Gynecologists (ACOG) in effect since 1992 states, "Labor results in severe pain for many women. There is no other circumstance where it is considered acceptable for a person to experience severe pain, amenable to safe intervention, while

under a physician's care."[1] Finally, ASA and ACOG have helped to clear this issue by declaring that a mother's request for pain relief is sufficient justification for her receiving it.[2]

**"Women have been having babies for centuries without medication, and they won't die if I don't give them an epidural. An epidural is not a medical necessity. Why do you think that everyone deserves an epidural?"**

The pursuit of effective labor pain relief has persisted from the first report of childbirth, and there is abundant documentation that this pursuit of pain-free labor has occupied a place of prominence in almost every culture. Haggard, in a book titled *Devils, Drugs and Doctors*, eloquently suggested that "the position of woman in any civilization is an index of the advancement of that civilization; the position of woman is gauged best by the care given her at the birth of her child. Accordingly, the advances and regression of civilization are nowhere seen more clearly than in the story of childbirth." Although it is true that patients don't die without labor analgesia, too often they *feel like* dying during labor!

**Can every laboring patient demand and expect to receive an epidural in labor?**

Obviously not. While maternal request represents sufficient justification for pain relief, the selected form of analgesia technique depends on the medical status of the patient and her fetus, the progress of labor, and the resources of the facility - including not only those of anesthesiology but also obstetrics and nursing. While most of us agree that patients in labor should not be denied pain relief for economic reasons, we should remember that there are some patients who cannot receive an epidural (for example, the coagulopathic patient), and there are logistical circumstances that, despite the best of intentions, can preclude the administration of an epidural. This is a vast country with extensive rural areas where medical access may be limited. Even in urban centers, there can be logistical problems that prohibit or delay epidural analgesia. For example, when three parturients in active labor all request an epidural at the same time, can they all expect an instantaneous response? Of course not. Likewise, hospitals with small obstetric services often have anesthesiologists who are also working in the operating room and depending on the nature of the other case(s) being covered, the anesthesiologist (or a backup) might be delayed in providing analgesia.

**"Is epidural block any better than parenteral opioid? I may need to give a patient analgesia, but I don't need to give them an epidural."**

Some anesthesiologists who wish to avoid administering neuraxial blockade on patients for whom the procedure will be poorly reimbursed have suggested that parenteral opioids are an excellent alternative for those without adequate insurance. The evidence clearly suggests the opposite. As stated in the "Guidelines for Perinatal Care" (American Academy of Pediatrics and American College of Obstetricians and Gynecologists), "Of the various pharmacologic methods used for pain relief during labor and delivery, lumbar epidural block is the most effective and least physiologically depressant, allowing for an alert, participating mother." Anyone who has witnessed a parturient who has received an adequate dose of parenteral opioid to relieve pain will tell you that the patient still complains during contractions and is usually sedated to the point of profound somnolence in between contractions. Several recent studies[3,4] have demonstrated that epidural analgesia provides far superior pain relief as compared to parenteral injections of meperidine, and epidural analgesia has been shown to be far less depressing on the homeostasis of both mother and fetus.[5]

*Are epidurals dangerous?*

An anesthesiologist recently sent a letter to his local newspaper suggesting that "epidurals are only one of several tools available. It is also the most invasive, requiring that a needle be placed into a patient's spine and medication injected directly into the central nervous system. Although this procedure is relatively safe (thanks to the skills and training of anesthesiologists), there are potential life-threatening risks involved with this technique." He continues, "When treating labor-induced pain, I, for one, am reluctant to begin with the most invasive and potentially the riskiest tool at my disposal in lieu of safer options." Do any anesthesiologists actually believe that statement? I think not. The argument that systemic opioids are safer than neuraxial techniques is deceptive for two reasons. First, epidurals are not dangerous and are eminently safe when placed by skilled anesthesiologists. Our patients should not be unnecessarily scared by reading fiction about the immense risks of epidurals. Second, it suggests that parenteral opioids are a reasonable alternative to neuraxial block, when for most patients they are not.

*Do I need to offer the same analgesia service to both insured and non-insured patients (or as stated in a recent e-mail sent to SOAP, "poor people can't expect to drive a Rolls Royce or to eat at a fine French restaurant, so why should they expect to receive the Cadillac of analgesics for free?")*

Although this is far more controversial than the preceding questions, the answer is clear. If we accept that neuraxial techniques provide more effective pain relief and are safer for the fetus, how can we suggest that we use inferior techniques on patients who have inferior insurance? Adequate pain relief in labor is not a luxury, and if we continue to suggest that neuraxial techniques are a purely luxury item, how long do you think that insurers will continue to reimburse us for these services?

*"There is no law that makes me provide my services for free to the indigent. If I'm not reimbursed, I won't provide the service." "Did the anesthesiologist have a moral obligation to provide a service that was not a medical necessity?" "Her alleged need does not justify the theft of services."*

This is incorrect reasoning, which makes us look very bad in the eyes of the public and may very well place the anesthesiologist in jeopardy of violating state and federal laws. Many of these so-called "uninsured" patients have Medicaid coverage and, therefore, they are actually insured and, according to the U.S. government, are entitled to the same treatment as patients with third-party insurance. Our patients (including even those who are uninsured or insured by managed care organizations that do not adequately reimburse anesthesiologists) are not stealing anything from us, and we should not practice in a way that will allow us to be accused of extorting money from them.

Obviously, none of us is happy about the present situation, but while we are lobbying for better reimbursement, we cannot let our patients (and our reputations as caring physicians) suffer. Socrates summed it up well by saying, "Divinum est sedare dolorem" (Divine is the work to subdue pain).

*"If public sentiment or state law requires that we 'work for free,' we will stop doing epidurals on all patients."*

Although there are some hospitals (mostly those with very few deliveries) that do not offer epidurals to any patient, this policy clearly puts the hospital and obstetricians at a consumer disadvantage if patients have a choice of hospitals. However, there are hospitals that, for many different reasons, do not offer epidurals. This is not the same as denying some patients epidurals, however. Patients and obstetricians delivering at

hospitals without an epidural service know that epidurals are not available. There are no surprises and there is no "double standard."

### Can we expect the situation to get any better?

Representatives of ASA, SOAP and many state component societies are working diligently with third-party payers and government agencies so that we *can* restructure our current system and guarantee a fair reimbursement for the care that we give our patients - all of our patients. There is presently a large Medicaid reimbursement disparity between obstetricians and anesthesiologists, and this inequality has put us at a major disadvantage. With aggressive lobbying efforts from all members of ASA and with the help of the media, we need to get the message to insurers and government agencies that this problem exists and cannot be ignored.

There is no question that we are being placed in an untenable situation by being expected to perform epidurals without fair reimbursement (sometimes without reimbursement at all), while incurring the same medical liability, but if we are to succeed, we must fight the reimbursing agencies, not the patients. It is obscene for anesthesiologists to provide services and not to be reimbursed, but the fairness that we seek will not occur overnight and it will not happen if we lose support of our patients or our obstetric colleagues. If reimbursement for labor analgesia is unacceptably low, anesthesiologists should also attempt to negotiate subsidization arrangements with their individual hospitals. Hospital administrators know that to stay competitive, their hospital must offer an on-demand epidural service, and in many cases, Medicaid reimbursement to hospitals is sufficient to allow the hospitals to partially support anesthesiologists who would otherwise be providing free care.

In an attempt to disseminate the message that anesthesiologists do care about their patients but that they have been unjustly pushed to the point where many feel that they cannot afford to continue practicing obstetric analgesia, I have appeared on ABC's Nightline show. The transcript can be found at <http://www.abcnews.com/onair/nightline/transcripts/ntl_980618_trans.html>. In addition, several SOAP Board members and I have been interviewed by the *Chicago Tribune* for an upcoming story that we have been told will discuss our plight and possible reasons why third-party payers and government agencies have disregarded our pleas and ignored the cries of our patients.

History has shown that health care is a consumer-driven market, and women can have major influences on the practice of childbirth and on reimbursement for labor and delivery services. We need to ensure that our patients, both individually and as members of organized women's groups, fight for us, for what is fair and for what is right. Some of the letters that were sent to SOAP and ASA or posted on the Internet place the anesthesiologist at odds with their patients and, in my opinion, will only do us harm.

In conclusion, I would like to quote my dear friend and colleague, Gerard M. Bassell, M.D., who wrote the following eloquent response in the most recent SOAP newsletter: "We are not simply technicians, we are skilled, caring physicians who have devoted our lives to the alleviation of pain during surgery and childbirth. The worth of our contributions should be recognized. Throughout all of this, the recipients of our services are our greatest advocates. We should never turn our back on the woman suffering though a painful labor to achieve a political or economic end."

### References:

1. Joint ASA-ACOG Statement, American Society of Anesthesiologists, Park Ridge, IL: October 21, 1992; amended October 1997.

2. American College of Obstetricians and Gynecologists: Committee Opinion: Pain Relief During Labor. Number 118, 1993.
3. Sharma SK, Sidawi JE, Ramin SM, et al. Cesarean Delivery. A randomized trial of epidural versus patient-controlled meperidine analgesia during labor. *Anesthesiology*. 1997; 87:487-494.
4. Ramin SM, Gambling DR, Lucas MJ, et al. Randomized trial of epidural versus intravenous analgesia during labor. *Obstet Gynecol*. 1995; 86:783-789.
5. Morley-Forster PK, Weberpals J. Neonatal effects of patient-controlled analgesia using fentanyl in labor. *Int J Obstet Anesth*. 1998; 7:103-107.

*David J. Birnbach, M.D., is Director of Obstetric Anesthesiology, St. Luke's-Roosevelt Hospital Center, and Associate Professor, College of Physicians and Surgeons, Columbia University, New York, New York.*

◆Contents◆
◆Other *NEWSLETTER* Issues◆

◆ **Professional Information**    ◆ **Public Education**    ◆ **Search**
◆ **Continuing Education**    ◆ **Related Organizations**    ◆ **What's New?**
◆ **Placement**    ◆ **What Is the ASA?**    ◆ **Contact Us**
◆ **Annual Meeting**    ◆ **What Is Anesthesiology?**

Copyright © 1999 American Society of Anesthesiologists. All rights reserved.

PLANTATION TAMARAC ANESTHESIOLOGY GROUP, INC.
4979 North University Drive, Suite 28
Lauderhill, Florida 33351-5790
(954) 741-4272  FAX (954) 749-1867

DATE:        February 2, 1999

TO:          All Physicians/CRNA'S

FROM:        Cecelia Trueman

SUBJECT:     Medicaid/Self-Pay Labor Epidural Patients


Effective January 1, 1999, the fee for Medicaid and Self-Pay Labor Epidural patients will
be $650.00.

Medicaid patients MUST sign the revised pink form so we can collect the fee of $650.00.
If a signature is not gotten, the payment must be refunded.  Please get the signature so we
can keep the payment.

The $650 fee policy issued by Sheridan Health Corp. for  Medicaid/Self-Pay Labor
Epidural Patients was effective on November 1, 1998.  We felt it best to start the new fee
as of 1/1/99.

Please use the PINK form, for Medicaid LE Patients, showing the revised date of 1/1/99
in the lower left-hand corner.

Please continue to use the Yellow form, for Self-Pay OB Patients, showing the revised
date of 1/1/99 in the lower left-hand corner.

I hope this clarifies any misunderstandings regarding the new policy by Sheridan Health
Corp.

**Plantation-Tamarac Anesthesiology Group, P.A.**
**4979 N. University Drive, Suite 28**
**Lauderhill, FL 33315**
**(954) 741-4272  Fax: (941) 749-1867**

### CONGRATULATIONS TO THE MOTHER TO BE!

In this area of high technology the anesthesiologist can become an important member of the birthing team. The labor epidural is an "elective" service as other means of pain relief are available (ex: stadol) as part of your obstetrical care.

The $650 payment must be paid to the Anesthesia Billing Office as listed above, or the "elective" labor epidural will not be administered by an anesthesiologist.

Please provide the information requested below, sign and return with your payment to our office.

PATIENT NAME: _____

ADDRESS: _____

PHONE#: _____  PT.SS# _____

OB/GYN: _____ PT.DOB: _____

EXPECTED DATE OF DELIVERY: _____

BE SURE TO BRING YOUR PAID STATEMENT WITH YOU WHEN YOU GO TO THE HOSPITAL TO DELIVER YOUR BABY AS CONFIRMATION OF PAYMENT.
**********************************************************************
TYPE OF PAYMENT:    CHECK    CASH    CREDIT CARD

CREDIT CARD:    VISA    MASTERCARD    AMERICAN EXPRESS

CREDIT CARD#: _____

CARDHOLDER NAME: _____  EXP: _____

SIGNATURE: _____
I also understand that if I have Medicaid or if I am applying for Medicaid, that the physician will not file to Medicaid for an "elective" labor epidural and therefore I am responsible for the full fee charge of $650. If the delivery is by Cesarean Section, Medicaid will be billed for this medically necessary service. The Cesarean Section will be a separate charge for which I am not responsible.

_____        _____
SIGNATURE OF EXPECTANT MOTHER                 MEDICAID NUMBER

PLEASE DISTRIBUTE THIS LETTER TO MEDICAID PATIENTS.

Rev.1/1/99



# MEDICAID PROVIDER AGREEMENT



STATE OF FLORIDA

AGENCY FOR HEALTH CARE ADMINISTRATION

The Provider agrees to participate in the Florida Medicaid program under the following terms and conditions:

(1) Discrimination. The parties agree that the Agency for Health Care Administration (AHCA) may make payments for medical assistance and related services rendered to Medicaid recipients only to a person or entity who has a provider agreement in effect with AHCA; who is performing services or supplying goods in accordance with federal, state, and local law; and who agrees that no person shall, on the grounds of sex, handicap, race, color, national origin, other insurance, or for any other reason, be subjected to discrimination under any program or activity for which the provider receives payment from AHCA.

(2) Quality of Service. The provider agrees that services or goods billed to the Medicaid program must be medically necessary, of a quality comparable to those furnished by the provider's peers, and within the parameters permitted by the provider's license or certification. The provider further agrees to bill only for the services performed within the specialty or specialties designated in the provider application on file with AHCA. The services or goods must have been actually provided to eligible Medicaid recipients by the provider prior to submitting the claim.

(3) Compliance. The provider agrees that the submission for payment of claims for services will constitute a certification that the services were provided in accordance with local, state and federal laws, as well as rules and regulations applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA.

(4) Term and signatures. The parties agree that this is a voluntary agreement between AHCA and the provider, in which the provider agrees to furnish services or goods to Medicaid recipients. Provided that all requirements for enrollment have been met, this agreement shall remain in effect for five (5) years from the effective date of the provider's eligibility unless otherwise terminated. This agreement shall be renewable only by mutual consent. The provider understands and agrees that no AHCA signature is required to make this agreement valid and enforcable.

(5) Provider Responsibilities. The Medicaid provider shall:

(a) Possess at the time of the signing of the provider agreement, and maintain in good standing throughout the period of the agreement's effectiveness, a valid professional, occupational, facility or other license appropriate to the services or goods being provided, as required by law.

(b) Keep, maintain, and make available in a systematic and orderly manner all medical and Medicaid-related records as AHCA requires for a period of at least five (5) years.

(c) Safeguard the use and disclosure of information pertaining to current or former Medicaid recipients as required by law.

(d) Send, at the provider's expense, legible copies of all Medicaid-related information to authorized state and federal employees, including their agents. The provider shall give state and federal employees, including their agents, access to all Medicaid patient records and to other information that can not be separated from Medicaid-related records.

(e) Bill other insurers and third parties, including the Medicare program, before billing the Medicaid program, if the recipient is eligible for payment for health care or related services from another insurer or person.

(f) Within 90 days of receipt, refund any moneys received in error or in excess of the amount to which the provider is entitled from the Medicaid program.

(g) Be liable for and indemnify, defend, and hold AHCA harmless from all claims, suits, judgments, or damages, including court costs and attorney's fees, arising out of the negligence or omissions of the provider in the course of providing services to a recipient or a person believed to be a recipient.

(h) Accept Medicaid payment as payment in full, and not bill or collect from the recipient or the recipient's responsible party any additional amount except, and only to the extent AHCA permits or requires, co-payments, coinsurance, or deductibles to be paid by the recipient for the services or goods provided. This includes situations in which the provider's Medicare coinsurance claims are denied in accordance with Medicaid's payment.

(i) Agrees to submit claims to AHCA electronically and to abide by the terms of the Electronic Claims Submission Agreement.

(j) Agrees to receive payment from AHCA by Electronic Funds Transfer (EFT). In the event that AHCA erroneously deposits funds to the provider's account, then the provider agrees that AHCA may withdraw the funds from the account.

(6) <u>AHCA Responsibilities</u>. AHCA:

(a) Is required to make timely payment at the established rate for services or goods furnished to a recipient by the provider upon receipt of a properly completed claim.

(b) Will not seek repayment from the provider in any instance in which the Medicaid overpayment is attributable solely to error in the state's determination of eligibility of a recipient.

(7) <u>Termination For Convenience</u>. This agreement may be terminated without cause upon thirty (30) days written notice by either party.

(8) <u>Ownership</u>. The provider agrees to give AHCA sixty (60) days written notice before making any change in ownership of the entity named in the provider agreement as the provider. The provider is required to maintain and make available to AHCA Medicaid-related records that relate to the sale or transfer of the business interest, practice, or facility in the same manner as though the sale or transaction had not taken place, unless the provider enters into an agreement with the purchaser of the business interest, practice, or facility to fulfill this requirement.

(9) <u>Complete Information</u>. All statements and information furnished by the prospective provider before signing the provider agreement shall be true and complete. The filing of a materially incomplete, misleading or false application will make the application and agreement voidable at the option of AHCA and is sufficient cause for immediate termination of the provider from the Medicaid program and/or revocation of the provider number.

(10) <u>Interpretation</u>. This agreement shall not be construed against either party on the basis of this agreement having been prepared by one of the parties.

(11) <u>Governing Law.</u> This agreement shall be governed by and construed in accordance with the laws of the State of Florida.

(12) <u>Amendment</u>. This agreement, the application and other documents being executed and delivered pursuant hereto constitute the full and entire agreement and understanding between the parties hereto with respect to the subject matter hereof. No amendment shall be effective unless it is in writing and signed by each party.

(13) <u>Severability</u>. If one or more of the provisions contained in this agreement or application shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(14) <u>Agreement Retention</u>. The parties agree that AHCA may only retain the signature page of this agreement, and that a copy of this standard provider agreement will be maintained by the Director of Medicaid, or his designee, and may be reproduced as a duplicate original for any legal purpose and may also be entered into evidence as a business record.

(15) <u>Funding</u>. This contract is contingent upon the availability of funds.

THE PARTIES AGREE THAT THIS AGREEMENT IS A LEGAL AND BINDING DOCUMENT AND IS FULLY ENFORCEABLE IN A COURT OF COMPETENT JURISDICTION. THE SIGNATORIES HERETO REPRESENT AND WARRANT THAT THEY HAVE READ THE AGREEMENT, UNDERSTAND IT, AND ARE AUTHORIZED TO EXECUTE IT ON BEHALF OF THEIR RESPECTIVE PRINCIPALS OR CO-OWNERS. THIS AGREEMENT BECOMES NULL AND VOID UPON TRANSFER OF ASSETS; CHANGE OF OWNERSHIP; OR UPON DISCOVERY BY AHCA OF THE SUBMISSION OF A MATERIALLY INCOMPLETE, MISLEADING OR FALSE PROVIDER APPLICATION UNLESS SUBSEQUENTLY RATIFIED OR APPROVED BY AHCA.

ALL PRINCIPALS, PARTNERS AND SHAREHOLDERS HAVING AN OWNERSHIP INTEREST OF FIVE PERCENT (5%) OR GREATER ARE REQUIRED TO SIGN THIS AGREEMENT. FAILURE TO DO SO WILL MAKE THIS APPLICATION, AGREEMENT AND PROVIDER NUMBER VOIDABLE BY AHCA.

---

FOR OFFICE USE ONLY

The provider's name is: _____ .

The facility's name is: _____ .

The provider number is: _____ .

---

IN WITNESS WHEREOF, the undersigned have caused this agreement to be duly executed under the penalties of perjury, swear or affirm that the foregoing is true and correct.

| _____ | | _____ | |
| Signature of Provider | Date | Signature of Provider | Date |
| _____ | | _____ | |
| (legibly print the above signature) | Title | (legibly print the above signature) | Title |
| _____ | | _____ | |
| Signature of Provider | Date | Signature of Provider | Date |
| _____ | | _____ | |
| (legibly print the above signature) | Title | (legibly print the above signature) | Title |
| _____ | | _____ | |
| Signature of Provider | Date | Signature of Provider | Date |
| _____ | | _____ | |
| (legibly print the above signature) | Title | (legibly print the above signature) | Title |
| _____ | | _____ | |
| Signature of Provider | Date | Signature of Provider | Date |
| _____ | | _____ | |
| (legibly print the above signature) | Title | (legibly print the above signature) | Title |
| _____ | | _____ | |
| Signature of Provider | Date | Signature of Provider | Date |

(USE ADDITIONAL PAGES IF NECESSARY)

# NAVON, KOPELMAN,
# O'DONNELL & LAVIN, P.A.
### ATTORNEYS AT LAW

Emerald Park Office Center
2699 Stirling Road • Suite B-100
Fort Lauderdale, Florida 33312
Telephone (954) 967-2788
Facsimile (954) 983-7021
E-Mail staff@nkolaw.com

Joel D. Kopelman
Andrew T. Lavin
Samuel D. Navon
Garry W. O'Donnell

Writer's Direct E-Mail: godonnell@nkolaw.com

Gregory M. Garno
David Kahan
Aron M. Mandl

July 9, 1999



**_VIA FACSIMILE_**

Jay Cohen, Esq.
Bunnell, Woulfe, Kirschbaum,
Keller, Cohen & McIntyre
Post Office Drawer 030340
Fort Lauderdale, FL 33301

      Re:    <u>Tirso J. Rojas, M.D.</u>

Dear Mr. Cohen:

      As you know, we represent Tirso J. Rojas, M.D. ("Dr. Rojas") in connection with the Physician's Employment Agreement ("Agreement") dated January 9, 1998, between Dr. Rojas and Taranco & Associates Anesthesiology Group, Inc., also known as Plantation-Tamarac Anesthesia Group, P.A. ("the Company"). We are sending this letter to you because in your June 10, 1999 letter, you advised us that you represented the Company and Sheridan Health Corp., Inc. in this dispute, and insisted that we not have any further communications directly with the individual designated to receive notice under paragraph 11(f) of the Agreement. Accordingly, this letter serves as notice of the Company's several substantial defaults and failure to meet material obligations under the Agreement.

      The Company has materially breached the Agreement. In this regard, the nature of this conduct by the Company, particularly in the context of the character of the relationship between the parties and patients, demonstrates that the material breaches are non-curable. Consequently, the Company has actually and constructively terminated the Agreement and effectively severed the relationship between the parties.

      While our investigation is continuing, we are in a position to summarize certain of the material breaches by the Company under the Agreement.

      First, as you were previously advised, Dr. Gold acknowledged receipt of a May 26, 1999 letter from Dr. Rojas which confirmed and memorialized the parties' mutual termination of the Agreement. Dr. Gold asked Dr. Rojas to come back in a few days for his release papers. When Dr. Rojas returned for his release papers, he was directed to Dr. Drozdow who told him the only

Jay Cohen, Esq.
July 9, 1999
Page -2 -

way he could leave was "for cause" and under the threat of a lawsuit for $1,000,000. Dr. Drozdow advised Dr. Rojas to engage an attorney.

Second, immediately after Dr. Drozdow's threats, in an apparent attempt to force Dr. Rojas to resign, the Company knowingly subjected Dr. Rojas to an arbitrary and unsafe schedule endangering patient care and resulting in physical and mental fatigue. Specifically, from Monday, June 29 through Sunday, July 5, 1999, Dr. Rojas was forced by the Company to work 100 patient contact hours. After working 45 hours in a three-day period, the Company assigned Dr. Rojas to a 24-hour call. When Dr. Rojas advised the Company that he was extremely tired, he was told that if he took a sick day, he would be fired for cause and all recommendations would be withheld.

Third, the Company has improperly, continuously and systematically deducted substantial amounts of money from Dr. Rojas' pay. Specifically, he has been charged and the Company has deducted monies from his payroll check for a vacation and sick days that are clearly "paid" under paragraph 3(c) of the Agreement.

Fourth, the Company and its attorney, Jay Martus, have forced Dr. Rojas and other physicians to engage in billing practices that appear to be improper under state and federal law, and which are specifically prohibited under paragraph 4(h) of the Agreement.

By way of example, the physicians, including Dr. Rojas, are under express directive of the Company and its attorney to directly charge patients delivering children for epidurals that would otherwise be covered by Medicaid. By express order of Mr. Martus, the physicians are required to collect (by check, credit card or cash) epidural charges at the time of treatment for Medicaid patients. When questioned by the physicians about this directive, Mr. Martus responded that it is too much money not to be collected. This reasoning does not appear to be correct and, according to the President of the Society for Obstetric Anesthesia and Perinatology, "may very well place the anesthesiologist in jeopardy of violating state and federal laws."

Fifth, the staffing has been so poor that Dr. Rojas has serious concerns about the quality and efficiency of patient care at the hospitals. Dr. Rojas believes this very serious problem stems from a planned corporate bottom line approach rather than from any temporary circumstances. The physicians have been told by top management to be "mean and lean."

Sixth, at one of the hospitals, major improprieties have occurred in certain records and reports. Although the Company is fully aware of this problem, nothing has been done to address it.

Finally, the Company changed the malpractice insurance policy in violation of paragraph 3(e)(i) of the Agreement. Specifically, the coverage was improperly lowered to a $250,000 deductible with a $1,000,000 annual aggregate limit.

Jay Cohen, Esq.
July 9, 1999
Page -3 -


For these reasons, we request that you immediately acknowledge the termination of the Agreement by Dr. Rojas for cause, and make prompt arrangements for the Company to deliver release papers with a full and unqualified recommendation. We also request that the Company pay all amounts due and owing to Dr. Rojas, including the improper deductions from his pay, a pro rata share of the $25,000 held back from his salary for 1999, and his percentage of retained collected accounts receivable (1/8 of approximately $100,000.00). Finally, arrangements should also be made for the Company to continue to provide at its expense insurance for medical claims as required under paragraph 3(e) of the Agreement.

As we previously advised you, Dr. Rojas will continue to fulfill all of his clinical obligations to mitigate his damages. Unless we receive your prompt cooperation, however, Dr. Rojas will be forced to pursue his legal remedies.

Very truly yours,

NAVON, KOPELMAN, O'DONNELL & LAVIN, P.A.

Garry W. O'Donnell

GWO:cc
cc:    Tirso J. Rojas, M.D.
E:\Rojas\corresp\cohen.jay.ltr04.wpd

Subj:   **Re: Reply to Inquiry**
Date:   7/27/99 8:17:53 PM Eastern Daylight Time
From:   Zuaza
To: MRogers@hcfa.gov

July 27, 1999


Dear Mr. Rogers:

Thank you for your response.  On June 16, 1998, an article titled "Child Birth Anesthesia, refusals spur prove," appeared on
Los Angeles Times, ( The text of the article can be obtained on the Internet at <http://www.latimes.com/>.) The article
described the alleged denial of an epidural analgesia to a Medicaid patient in California.  This patient was denied analgesia
because of her insurance which was Medicaid and her inability to come up immediately with $400.00 in cash. This article was
followed by Nightline ABC News, on June 18, 1998, where the President of the society for Obstetric Anesthesia  and
Perinatology was interviewed along with Ms. Gail Wilensky, former Bush Health Care Advisor, who said, and I quote " That
what happened in California was wrong an illegal." that transcript can be found at
http://www.abcnews.com/onair/nightline/transcripts/ntl_980618_trans.html .
The president of the American Society of Anesthesiologist stated that pain during child birth is no different than severe pain
suffered by a person after surgery or a person who has been shot or in an accident, it is accepted that epidural analgesia
provides more effective pain relief an is safer for the fetus, he says that we should not use inferior techniques on patients that
have "inferior insurance, ei Medicaid",
In response to your questions I am, an Anesthesiologist that wishes to remain anonymous but can provide you with all the
information and records with names and dates of patients who where subjected to what led me to get a hold of you guys.
I am an employee of Plantation Tamarac Anesthesiologist, which is owned by Sheridan Health Corporation, which is a multi
specialty physician group.  They employ obstetricians, pediatrician, neonatologist, emergency room doctors, radiologist,
anesthesiologist etc. we all participate with Medicaid and Medicare programs, the services that I provide are at Plantation
General Hospital, In Plantation, Florida, but Sheridan also provides Obstetric Analgesia at Hollywood Memorial Hospital, and
Memorial West Hospital, all located in Broward County, Florida.
The services that I am complaining about are not under managed care arrangement.
and to answer your last question, the charge slips are made out to the physician.

My complains are as follows:
Medicaid patients are denied epidural analgesia, even if ordered by the obstetrician, if they do not pay $650.00 cash or credit
card.  I have a copy of the memo from the Sheridan to enforce this policy, to me this is abusive behavior and neglect of
Medicaid patients ansd it causes them pain and suffering, Medicaid patients are getting inferior quality of care and this is
inconsistent with the standard of medical practice within the community.  The nurses in the hospital have been given orders
not to bother calling the anesthsiologist for analgesia if the Medicaid patient does not have the above requirements.
Sometimes Medicaid patients, after having paid the $650.00, for the labor epidural analgesia, and they have to have a C-
section, Sheridan will bill separate to Medicaid for the C-section, in other words they are collecting double.
My question to you is, Is this a violation of FL STs409-920? and 409-913? Once again I would like to reiterate that I posses
copies of bills with all the necessary information.
I do not know if this is important to you but I have the merchant numbers for Visa, MC and Amex, that Sheridan uses for the
Medicaid patients.

If you need to get in touch with me please feel free to do so.  I do wish to remain anonymous.
 I am interested in your promt response.
ZUAZA@aol.com



Gilbert Drozdow
08/18/99 05:09 PM

To:      AnesthesiaChiefs, AnesthesiaViceChiefs, Anesthesiologists
cc:      Corporate

Subject:   Policy Change on Medicaid Epidurals

In accordance with new Medicaid guidelines issued by the Agency for Healthcare Administration in the State of Florida, effective August 1, 1999 Sheridan Healthcorp, Inc. *will accept* Medicaid assignment for all procedures requiring anesthesiology services on our obstetrical units. Based on this policy, every Medicaid insured patient is to be considered fully covered for any and all obstetrical anesthesiology services. This will mean that any Medicaid patient requesting epidural analgesia under our care will not be responsible for making any payments, nor should any payments be requested. Signed waivers or any other documentation as previously required from these patients are no longer to be used and should be discarded. This new policy *does not* include uninsured or self-pay patients, insured patients without obstetrical insurance coverage, nor insured patients with unmet deductibles or relevant limits of insurance coverage. Any Medicaid patient retroactive to this announcement who have made payments for services after August 1, 1999 will receive the appropriate refund.

All Anesthesiology Directors and Vice Directors are responsible to communicate this new policy to their Departmental staff. Any questions should be addressed to my attention.



STATE OF FLORIDA
## AGENCY FOR HEALTH CARE ADMINISTRATION

April 14, 2000

Tirso J. Rojas, MD.
6463 NW 102 Terrace
Parkland, FL  33076

Re: Epidural billing

Dear DR. Rojas,

Please find enclosed a copy of the section on epidurals, from the Medicaid
Physician Coverage and Limitations Handbook.  I believe this answers your
question as to epidural billing of Medicaid recipients in a hospital setting.

Should you have any further questions regarding this matter, please feel free
to contact me at (954) 202-3200, Ext. 110.

Sincerely,

Steven M. Comeau
Human Services Program Specialist

Physician Coverage and Limitations Handbook

## Anesthesia Services, continued

| Labor Epidurals | Anesthesiologists may not refuse to provide a labor epidural to a Medicaid recipient or ask for remuneration in cash for the procedure at the time the woman is in labor. Labor and delivery are considered emergency services. As such, all medically-necessary services, including necessary services to control pain, are considered emergency services. |
| --- | --- |
| | The decision to have a labor epidural is to be decided between the recipient and her anesthesiologist in consultation with the obstetrician. No means of coercion, dissuasion, or refusal by a anesthesiologist to provide medically-necessary pain relief to a recipient in labor shall be utilized in determining this decision. |
| Monitored Anesthesia Care (MAC) | Monitored anesthesia care (MAC) must be requested by the attending physician, made known to the patient, and performed in accordance with the institution's accepted procedures. |
| | To be reimbursed for MAC, the anesthesiologist must meet the following requirements:<br>• perform a pre-anesthetic examination and evaluation;<br>• prescribe the required anesthesia;<br>• personally participate in or have medical direction of the entire plan of care;<br>• be continuously physically present when personally participating in the case;<br>• be approximately present and available for diagnosis or treatment of emergencies when medically directing a case;<br>• observe all institutional regulations pertaining to anesthesia services; and<br>• furnish all the usual services that are performed by an anesthesiologist. |
| MAC Reimbursement | Medicaid reimburses MAC at the same rate as general or regional anesthesia. To receive reimbursement, the provider must add a QS modifier to the appropriate procedure code. |
| Codes and Fees | See Appendix J in this handbook for a list and description of procedure codes. |

Tirso J. Rojas, M.D.
6463 N.W. 102nd Terrace
Parkland; FL33076

December 30, 1999

## CONFIDENTIAL

**VIA FACSIMILE & CERTIFIED MAIL RETURN RECEIPT**

Attn: Mitchell Eisenberg, President
Taranco & Associates Anesthesia Group, Inc.
Sheridan Healthcorp, Inc.
4651 Sheridan Street
Suite 600
Hollywood, Florida 33021

Dear Dr. Eisenberg:

This letter will bring directly to your attention several serious matters that need to be addressed by Taranco & Associates Anesthesia Group, P.A. ("TAG") and other anesthesia groups owned or managed by Sheridan Healthcorp, Inc. and its related companies ("Sheridan"). These matters have been previously brought to the attention of TAG by me. Also, I believe it is very important that these matters be disclosed by you to the appropriate governmental agencies.

I am extremely concerned about a number of things I have been asked to do and matters that I have witnessed as an anesthesiologist for TAG at Plantation General Hospital. Some of these concerns are outlined below. I believe these improper billing practices were implemented at other hospitals by anesthesia groups owned or managed by Sheridan.

First, I have witnessed wholesale and improper discrimination in extracting payments directly from Medicaid patients for labor epidurals entirely covered by Medicaid and which should have been provided at no cost to the patient. The Medicaid Provider Agreement is very clear on this point. Only after I reported this matter to the government did TAG and Plantation General stop this practice. A memo circulated by Sheridan, however, incorrectly states that the practice was stopped due to a change in government policy. I am unaware of any such change in policy, or reason why the practice stopped other than my disclosure to the government.

Mitchell Eisenberg, President
December 30, 1999
Page 2

_____

Second, a related issue involves over billing for Medicaid patients who paid $650.00 for labor epidurals and subsequently had a C-Section. In these cases, Medicaid was improperly and additionally billed for the anesthesia time during the C-Section. After reporting this improper billing practice, Sheridan stopped, but I do not believe the overcharges have ever been disclosed or by Sheridan returned to the government.

I received a copy of a letter from an attorney for TAG and Sheridan which threatens me with loss of my position and a lawsuit because I have raised these and other issues. The type of conduct I have described above is not right and should be corrected and reported to the appropriate authorities. I am ready to help you address any of these specific issues, but you must understand these are very serious matters and I cannot remain silent in the face of what I believe to be substantial wrongdoing. Conservatively speaking, I believe TAG and Sheridan have improperly obtained many hundreds of thousands and perhaps millions of dollars in payments from Medicaid patients who received labor epidurals covered by Medicaid, and have overcharged the government many hundreds of thousands of dollars in improper billing for C-Sections.

Please give these matters your immediate attention. Also, I am enclosing an extra copy of this letter so that you can send it directly to Plantation General Hospital and other hospitals at which Sheridan provides anesthesia and engages in these improper billing practices.

Yours very truly,

Tirso J. Rojas, M.D

STATE OF FLORIDA          )
                                          ) ss:
COUNTY OF BROWARD   )

The foregoing instrument was acknowledged before me this ⅔ day of December, 1999 by Tirso J. Rojas, M.D., who is  personally known to me.

Notary Public, State of Florida

My Commission Expires:

OFFICIAL NOTARY SEAL
MARIA E SAMANIEGO
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC659096
MY COMMISSION EXP. JUNE 26,2001



February 14, 2000

***VIA CERTIFIED MAIL***
***RETURN RECEIPT REQUESTED***

Tirso J. Rojas, M.D.
6463 NW 102nd Terrace
Parkland, Florida 33076

Dear Dr. Rojas:

I am writing to you to respond to your December 30, 1999 letter to Mitchell Eisenberg. In that letter you made a few accusations against Sheridan Healthcorp, Inc. ("Sheridan") and Taranco & Associates Anesthesia Group, P.A. ("TAG") which require a response.

Despite your accusations, at all times that Sheridan and TAG collected payments from Medicaid patients it was in conformity with applicable laws, regulations and rules. Sheridan and TAG timely changed their policies to conform to a January 1999 regulatory change well before you expressed any concerns. We suggest you study HCFA's and Florida AHCA's rules as they existed prior to January 1999 and see that your concerns are not grounded in law or fact.

You should be aware that if you or your agents publish these false statements to third parties, you and your agents can be held liable for defamation. Sheridan is concerned about its and it's subsidiaries' and affiliates' compliance with applicable laws and regulations and makes a consistent concerted effort to be amongst the most compliant providers.

Your suggestion that you have been threatened with the loss of your job as a result of these accusations is completely groundless. You have been asked to sign a waiver of staff privileges for the Columbia Hospitals where you work. You already agreed to that same waiver in the employment agreement you signed in connection with Sheridan's acquisition of TAG, and you also agreed to sign Columbia's waiver. Every other physician employed by TAG and Sheridan who works at a Columbia Hospital is required to and has signed the same waiver you refuse to sign. Your failure to sign these waivers puts TAG in breach of its obligations to the Columbia Hospitals where you work. This has nothing to do with any accusations you have made. You simply have breached your clear and unequivocal obligations under your employment agreement.

Tirso J. Rojas, M.D.
February 14, 2000
Page 2

      If you want to continue to be employed, you will comply with your obligations and sign the enclosed waivers. If you do not sign the waivers and return them to me at the Sheridan corporate office address on or before February 29, 2000, then your employment agreement shall be terminated for cause, effective March 1, 2000. In that event, Sheridan will take any and all actions against you to recover all of its damages from your breach of contract.

                                            Very truly yours,

                                            Gilbert Drozdow, M.D., M.B.A.
                                            Vice President, Hospital-Based Services

GD:sls
Enclosures
cc: Jay A. Martus, Esq.

Q:\Legal l\Jay l\Jamltrs\rojas2142000.wpd



**Tirso J. Rojas, M.D.**
**6463 N.W. 102nd Terrace**
**Parkland, FL33076**

February 23, 2000

**CERTIFIED MAIL RETURN RECEIPT**

Attn: Gilbert Drozdow, M.D., M.B.A.
Vice President, Hospital-Based Services
Sheridan Healthcorp, Inc.
4651 Sheridan Street
Suite 400
Hollywood, Florida 33021

Dear Dr. Drozdow:

I received your February 14, 2000 letter and disagree with the statements you made about billing practices based upon the investigation I have conducted. Please send me the pertinent information referenced in your second paragraph.

In this letter you indicate that I have failed to sign the Affidavits and Agreements. You are wrong. Enclosed are copies of the Affidavit and Agreement, that I signed on December 29, 1999 and delivered to Dr. Taranco the next day.

If these originals have been misplaced, I have enclosed two more copies signed February 23, 2000. These signed copies are delivered under the same circumstances stated by me in the ones signed on December 29th.

Yours very truly,

Tirso J. Rojas, M.D

For: LEADERMAN, STUART                    From: STUART LEADERMAN
     Thur Oct 14, 1999 5:36 pm        Taken by: STUART LEADERMAN (EXT6600)

10/14/99
To: All Anesthesia Staff

Please note that we are allowed to add up to 15 minutes of anesthesia time for the pre op interview and examination. Medicare does not allow you to add more than 15 minutes. This additional time should be incorporated into your overall time sent to the office on our billing sheet. For example: If the patient enters the OR suite at 9:30 AM. and your interview lasted 15 minutes, you should enter the anesthesia start time on OUR BILLING record as 9:15AM. We
must use caution as the 9:15 starting time used in the last
case must be at least 5 minutes after the ending time of the prior case. You MUST DOCUMENT on your anesthesia record that the interview and exam was performed, and the time period it was performed. (ie: interview and exam from 9:15 to 9:30.)



# *ANESTHESIA BILLING PROCEDURE MANUAL*




SHERIDAN

## PRE-OPERATIVE EVALUATION

The time spent in the evaluation of a surgical patient pre-operatively is not separately reimbursable as it is considered in the base units of the procedure. A **Basic Value**, as defined by *A Guide For Anesthesia Values,* includes the value of all usual anesthesia services except the time spent in anesthesia care and any modifiers. The usual anesthesia services included in the Basic Value include the usual pre-operative and post-operative visits, the administration of fluids and/or blood products incident to the anesthesia care and interpretation of non-invasive monitoring (ECG, temperature, blood pressure, oximetry, capnography, and mass spectrometry). When multiple surgical procedures are performed during a single anesthetic administration, the Basic Value is that of the procedure with the highest unit value.

The Correct Coding manual provides that an E/M service may **NOT** be billed if the only service the anesthesiologist performs is a preoperative evaluation for clearance purposes in place of an attending or consulting physician service. On the other hand, if *all* of the requirements for a consultation are satisfied, Medicare rules would authorize the anesthesiologist to bill for the service. Whether a preoperative evaluation would meet the criteria for a consultation – including the medical necessity for the consultation, a written request from another physician, and a history, examination, and written report, or would be viewed as an effort to bypass the rebundling rules – would depend upon the facts of a particular situation.

## CANCELED SURGERY

If surgery is canceled as a result of the anesthesiologist's preoperative exam or before anesthesia is induced, the anesthesiologist's services may be compensated by billing an appropriate E/M visit code or a consultation, if the requirements for a consultation are met. But the anesthesiologist must do another preoperative exam when the patient returns for surgery in order to establish that the first examination was not the preoperative exam.

If anesthesia is induced before surgery is canceled, the anesthesiologist would bill for the anesthesia service that was going to be performed with a reduced service modifier and actual time. Payment is in the discretion of the carrier, but generally it will be three base units for induction plus time.

2

4/25/00

I received this message from Sue Dauber at Sheridan in reference to pre op interview and billing:

The **original pre-op evaluation and examination is included in the base units** of the procedure and **must** be performed by the **anesthesiologist**. Therefore, time involved in this evaluation is **NOT** billed separately. **Anesthesia time involves the continuous actual presence of the anesthesiologist/CRNA and starts when the physician or anesthetist begins to prepare the patient for anesthesia care in the operating room or equivalent area and ends when the anesthesiologists/ CRNA is no longer in personal attendance, i.e. when the patient may be safely placed under post-operative supervision.** The ASA feels that pre-op or holding room time should start when the patient has been taken to the OR and anesthesia is started. They feel that **identifying the patient, etc. should not be counted in the time of the pre-op time**. I discussed this issue with Dr. Charles Novack at the ASA Legislative Meeting in Washington, DC and again at the FSA meeting in Orlando and he feels that the time should really start as described above. Please call me or beep me (1-800-509-9687) if I have not answered your question sufficiently.

I feel that the administration of sedatives (Versed ect.) or initiation of IV's in the pre-op holding area constitutes anesthesia care /expertise. The time spent with the patient during actual medication administration /monitoring  or IV starts should be **DOCUMENTED on the anesthesia record and BILLED.** All other time spent with the patient preoperatively is part of the base units described above. Please follow these guidelines.
Dr L

**Subject: Re: [Fwd: interview time]**
   **Date:** Mon, 8 May 2000 17:15:51 -0400
   **From:** "Gilbert Drozdow" <gdrozdow@shcr.com>
      **To:** gasdoc@mediaone.net
      **CC:** drwakeup@aol.com, leader8@hotmail.com, "Sue Dauber" <sdauber@shcr.com>


YOU CANNOT BILL FOR PREOPERATIVE TIME IF THAT IS WHEN YOU DO THE ANESTHESIA
PREOPERATIVE ASSESSMENT!!!!!

Preop time is billable when the provider has direct face to face interaction
with the patient before going into the OR while in the holding area and provides
medical care, such as reevaluation of the patient, answering questions from the
patient, starting an IV YOURSELF, giving sedatives YOURSELF, placing an axillary
block or epidural for anesthesia YOURSELF, etc.  NOT CVPs, ART LINES, or SWAN
GANZ catheters since these procedures are billed using procedure codes and time
cannot be billed for their time!!!!! The time you spent and what you did must be
clearly written on the anesthesia record with both the START TIME and the END
TIME.   You can bill for interrupted preop time but only if you clearly write
each period of time on the medical record.  Remember, if it ain't on the medical
record, you didn't spend the time, and an auditor will only care what is
documented in the record.  The billing card is useless in defending yourself.
Got it?  If not call me at 986 7558.
By the way, if you are medically directing a CRNA then the medically directing
physician  CANNOT bill for their time.  Only the CRNA can bill for time in this
case.  There are further complications as well which Sue Dauber will discuss
when she gets to your group for education.  Everything I said in the first
paragraph applies to a doctor doing his own case only or another physician who
is not medically directing CRNAs.

In a message dated 12/14/99 9:30:22 AM Eastern Standard Time, jmartus@shcr.com writes:

<< Subj:      Communications with Attorneys, Meetings and Depositions
Date: 12/14/99 9:30:22 AM Eastern Standard Time
From: jmartus@shcr.com (Jay Martus)
To:    EVERYONE@shcr.com (EVERYONE)

If an attorney or anyone calling on behalf of an attorney contacts you and asks
to speak with you or any other employee or to arrange a meeting or a deposition
regarding anything to do with Sheridan or the company you work for, please
explain that you are represented by legal counsel, and refer them to Sheridan's
Legal Department, 954-986-7770. Do not make any arrangements with them and do
not speak with them regarding any matter, except to tell them you are
represented by legal counsel and refer them to Sheridan's Legal Department. If
you receive a subpoena for deposition which requires an appearance, fax it
immediately to 954-987-8359 and confirm its receipt by speaking to someone in
the legal department. If you have any questions regarding this policy, please
call me. Thank you.

---------------------- Headers ----------------------------
Return-Path: <jmartus@shcr.com>
Received: from rly-zb01.mx.aol.com (rly-zb01.mail.aol.com [172.31.41.1]) by
air-zb04.mail.aol.com (vx) with ESMTP; Tue, 14 Dec 1999 09:30:22 -0500
 Received: from smtp.shcr.com (smtp0.shcr.com [208.35.159.7]) by rly-zb01.mx.aol.com
(v66.4) with ESMTP; Tue, 14 Dec 1999 09:30:09 -0500
 Received: by smtp.shcr.com(Lotus SMTP MTA v4.6.3 (733.2 10-16-1998)) id
85256847.004E2900 ; Tue, 14 Dec 1999 09:13:43 -0500
X-Lotus-FromDomain: SHERIDAN HEALTHCORP
From: "Jay Martus" <jmartus@shcr.com>
To: "EVERYONE" <EVERYONE@shcr.com>
Message-ID: <85256847.004E27B3.00@smtp.shcr.com>
Date: Tue, 14 Dec 1999 09:13:32 -0500
Subject: Communications with Attorneys, Meetings and Depositions
Mime-Version: 1.0
Content-type: text/plain; charset=us-ascii
Content-Disposition: inline

   >>

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States ex rel.
State of Florida ex rel
Tirso J. Rojas, M.D.

**DEFENDANTS**

Sheridan Healthcare Inc. and
Sheridan Healthcorp

00 - 7071

CIV-FERGUSON

MAGISTRATE JUDGE
SNOW

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Broward
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)  954-967-2788
Garry W. O'Donnell, Esq.
Navon, Kopelman, O'Donnell & Cavin, P.A.
2699 Stirling Road B-100 Fort Lauderdale 33312

ATTORNEYS (IF KNOWN)

0:00CV 7071 WDF/SS

(d) CIRCLE COUNTY WHERE ACTION AROSE:    DADE,    MONROE,    (BROWARD,)    PALM BEACH,    MARTIN,    ST. LUCIE,    INDIAN RIVER,    OKEECHOBEE,    HIGHLANDS

## II. BASIS OF JURISDICTION    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury Med. Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers Liability | | B☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | PERSONAL PROPERTY | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| B☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | B☐ 690 Other | B SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | A CIVIL RIGHTS | PRISONER PETITIONS | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 442 Employment | HABEAS CORPUS: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | B☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | | B☐ 550 Civil Rights | | | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 555 Prison Condition | | | A OR B |

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

31 U.S.C. 3730   Violations of Federal False Claims Act

LENGTH OF TRIAL
via ____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ YES    ☐ NO

## VIII. RELATED CASE(S) IF ANY    (See instructions)

JUDGE _____    DOCKET NUMBER _____

DATE  7/28/00

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  520067   AMOUNT  $150.00   APPLYING IFP ____    JUDGE ____    MAG. JUDGE ____